IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

SENIOR SETTLEMENTS, LLC,

                Plaintiff,

      v.

GROWTH TRUST FUND, <u>et al.</u>,

                Defendants.

HONORABLE JEROME B. SIMANDLE

Civil No. 05-777 (JBS)

**OPINION**

APPEARANCES:

Michael O. Kassak, Esq.
Edward Koch, Esq.
WHITE AND WILLIAMS, LLP
457 Haddonfield Road
Suite 400
Cherry Hill, New Jersey 08002
    Attorneys for Plaintiff

Jonathan W. Wolfe, Esq.
Kenneth Mark Schultz, Esq.
SKOLOFF & WOLFE, PC
293 Eisenhower Parkway
Livingston, New Jersey 07039
    Attorneys for Defendants

**SIMANDLE**, U.S. District Judge:

**I.    INTRODCUTION**

    This matter is before the Court on cross-motions for partial summary judgment by Plaintiff Senior Settlements, LLC ("Plaintiff" or "Senior Settlements") [Docket Item 31], seeking a declaration that valid and enforceable contracts existed between the parties and that Defendants attempted to rescind them in bad faith (Counts One and Three), and by Defendants Growth Trust, Abraham Weingarten, Michael Steinmetz, Leah Cohen and Bernat

Steinmetz, [Docket Item 32] for complete summary judgment, on the grounds that no contract existed and seeking an order that Defendants must repay all money they withdrew from the subject life insurance policies.  The Court has reviewed the submissions of the parties, heard oral argument on the motions, and reviewed the supplemental submissions of the parties.  The principal issue to be determined is whether Plaintiff can demonstrate that the contracts it seeks to enforce were ever formed in conformity with New Jersey law.  For the reasons explained below, the Court shall deny Plaintiff's motion [Docket Item 31] and grant Defendants' motion [Docket Item 32], finding upon the undisputed facts that no contract was formed.

## II.  BACKGROUND

This case arises out of a dispute over whether a contract was properly formed between Plaintiff, Senior Settlements, LLC, and Defendants Growth Trust, Abraham Weingarten, Michael Steinmetz, and Leah Cohen.  Bernat Steinmetz is also a Defendant in this matter.  Senior Settlements is a New Jersey limited liability corporation, with its principal place of business in Cherry Hill, New Jersey (DUMF[1] ¶ 1) and is in the "life settlement business," whereby it purchases the beneficial right

---

[1]  "DUMF" is the statement of undisputed material facts filed in support of defendants' motion for summary judgment. "PUMF" is the statement of undisputed facts filed in support of plaintiff's motion.  Those documents are cited only when the facts are truly undisputed.

2

to life insurance proceeds in exchange for a lump-sum payment to the owner of the insurance policy.  (PUMF ¶ 2.)  No Defendants are citizens of New Jersey.  (Compl. ¶¶ 1-8.)  This Court has diversity jurisdiction under 28 U.S.C. § 1332 and New Jersey law governs this contract dispute.

In this case, Defendant Bernat Steinmetz was the original owner of three insurance policies insuring his life, one issued by North American Company and two by American General ("the policies").  (DUMF ¶ 3, PUMF ¶¶ 7-10.)  On or about January 4, 1992 Bernat Steinmetz created the Defendant Growth Trust Fund ("the Trust") and placed the policies in the Trust, conveying ownership of the policies to the Trust.  (PUMF ¶¶ 8, 9.)  The trustees of the Trust were Defendants Abraham Weingarten, Fay Weingarten, Michael Steinmetz, and Leah Cohen ("the Trustees"). (PUMF ¶ 11.)

The North American Company policy has an initial death benefit of $1 million and the American General policies have benefits of $2 million each.[2]  (DUMF ¶ 3.)  On or about June 25, 2004, Senior Settlements presented the Trustees with documents, purporting to be offers to buy the Policies.  (PUMF ¶ 12, Ex. D

---

[2]    However, the value of the policies has been reduced by cash withdrawals made by Senior Settlements in the amount of $165,000.  Specifically, Senior Settlements withdrew $76,000 from the North American Company policy, $45,000 from one of the American General policies and $44,000 from the other.  Defendants learned of these withdrawals during discovery in this case.

to Wolfe Cert. (the agreements)).  The proposed purchase prices

for the policies were $318,797 for the North American Company

policy and $648,133 for each of the American General policies.

(DUMF ¶ 5, ¶ 2 of the agreements.)

Paragraph 19 of each of the purported offers, labeled

"Performance," states:

> This Agreement has been executed first by the
> Purchaser [Senior Settlements] as an offer to
> purchase the Policy hereunder, which offer
> shall be open for acceptance by Seller until
> 5:00 p.m. on 7/23/04, at which time the offer
> shall be deemed to be withdrawn unless
> Purchaser has received a fully executed
> counterpart to this Agreement from Seller.
> Time is of the essence in this Agreement.

(Ex. D to Wolfe Cert.)  In fact, however, none of the purported

offers had been executed first by Senior Settlements, nor have

they ever been signed.  (1Fede Dep. 88:21 to 89:4 in Ex. E to

Wolfe Cert.)  Deposition testimony indicated, quite remarkably,

that Senior Settlements intentionally does not sign its purported

offers to avoid being bound by them when the policy owners sign.

(2Fede Dep. 21:1-7 in Ex. F to Wolfe Cert.)

Defendants argue that these documents cannot be offers

because they were not signed, as required by their own terms,

and, even if they had been, the offers expired, by their own

terms, before any acceptance occurred.

There is no dispute that the Trustees did not agree to the

purchase of the policies within the time limit in the purported

4

offer.  By e-mail dated July 30, 2004 Senior Settlements

indicated that the delay in receiving the signed agreements might

cause its offer price to change and stated that if it did not

soon receive the signed agreements and other documents required

under the agreements it would rescind the offer.  (Ex. G to Wolfe

Cert.)  The e-mail to Defendants' agent stated:

> As you know, we have been waiting for the
> documents on Steinmetz for weeks now.  We have
> also requested the proper releases so we can
> complete our due diligence and underwriting
> required to acquire and fund the purchase.  To
> date, we have received neither.
> When, and if we receive these documents back
> we must begin our process.  It may take weeks
> to receive the illustrations and VOC.  By that
> time all medical information will be stale
> dated and we will require new meds and
> underwriting. [T]here is a possibility LE will
> change and cause our pricing to differ.
> Additionally, interest rates from the insurer
> may change causing additional premiums
> required to carry the policy.  This will also
> change our pricing.
> The end result here is that if we do not
> receive the documents in the next few days I
> am going to rescind the offer.  We may open it
> again and reprice based on updated information
> if your client wants to proceed.

Defendants did not attempt to accept until after the time to do

so had expired, on or about August 10, 2004.[3]  (DUMF ¶ 22.)

Although that was only a week and a half after the e-mail was

sent, the e-mail indicated that the price term had become

---

[3]  All of the Trustees confirmed that they signed the
Agreements and that their signatures were genuine.

uncertain and that a delay of "weeks" was significant to Senior Settlements.

In mid- to late September, the designation of ownership of the policies was changed to Senior Settlements.  (PUMF ¶ 23.) Defendants had signed change of beneficiary and ownership forms in early September, and, at least as to the AGI policy, Defendants reiterated that request in late September when they sent additional documentation requested by AGI to effectuate the change.  (Exs. GG, HH & II to Pl's Opp. to Defs' Mot for Summ. J.)  At oral argument, counsel for Senior Settlements indicated that Senior Settlements sent in the change of ownership forms. (Tr. at 11:24-25.)  Thus, it is not clear that Defendants were aware that the change of ownership forms were sent to the insurance companies or that the change actually occurred, as Defendants continued paying the premiums on the policies.  (Fede Dep. 96-99, Pl.'s Ex. H.)  There is no evidence that Plaintiff communicated anything to Defendants at that time.  Further, Plaintiff made no payment to Defendants at that time.  Soon a dispute arose regarding whether a contract had been formed and whether, if it had, Defendants could rescind it.

Defendants apparently expected to receive a signed copy of the agreements from Senior Settlements once it agreed to be bound, but none was ever sent.  On October 21, 2004 Bernat Steinmetz wrote to Senior Settlements directing it not to proceed

with any life settlement until he received a copy of the
agreements.  (Ex. H to Wolfe Cert.)  Bernat Steinmetz was not a
party to any of the purported contracts, nor did he have any
authority to speak for the Trust.  (Ex. JJ to Pl.'s Opp. to Defs'
Mot. for Summ. J.)  Nevertheless, Senior Settlements immediately
responded and requested a notarized copy of Mr. Steinmetz's
signature.  (Ex. I to Wolfe Cert.)  Bernat Steinmetz faxed a
notarized signature to Senior Settlements that same day.  (Ex. J
to Wolfe Cert.)  Senior Settlements, apparently realizing that
Bernat Steinmetz was not a party to any agreement, responded that
it needed original, not faxed, copies of his signature and that
it also needed notarized signatures of the owners of the policies
and advice from them on how to proceed.  (Ex. K to Wolfe Cert.)
On October 28, 2004 Steinmetz sent a signed, notarized letter
indicating that he and the Trustees wished to rescind any
agreement to sell his life insurance policies.  The letter was
not signed by the Trustees.

     There is additional notarized correspondence in the record
from trustee Faye Weingarten, dated October 22, 2004, advising
Senior Settlements not to proceed with any life settlement until
the contracts were received.  (Pl.'s Ex. P.)  On October 28, 2004
Michael Steinmetz, also a trustee, faxed and mailed a withdrawal
to Senior Settlements noting that "the Trustees and the Insured
Bernat Steinmetz hereby withdraw all of the Sale Offers for the

Steinmetz policies," which were identified by company and policy number, "effective immediately." (Pl.'s Ex. S.)  The withdrawal notice also indicated that if Senior Settlements thought the agreements had become legally enforceable, the Trustees were electing to rescind and terminate them.  "The Trustees and the Insured Bernat Steinmetz do not wish to cause a sale of the Steinmetz Policies in accordance with the terms and conditions set forth in the withdrawn Sale Offers." (Id.)  The letter was signed and notarized by Michael Steinmetz.

By that time, Senior Settlements had withdrawn money from the policies.  But Senior Settlements admitted at oral argument that Defendants were completely unaware of that fact. (Tr. at 17:21-25.)

Thereafter, Senior Settlements attempted to tender payment to Defendants, but the Trustees returned the checks and indicated that the funds were "unsolicited" and that any additional funds would not be accepted.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence

in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable inferences from the evidence, the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered." U.S. v. Premises Known as 717 South Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e))(citations omitted).

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The summary judgment standard does not change when, as here, the parties have filed cross-motions for summary judgment. See Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it
> alone is entitled to summary judgment, and
> the making of such inherently contradictory
> claims does not constitute an agreement that
> if one is rejected the other is necessarily
> justified or that the losing party waives
> judicial consideration and determination
> whether genuine issues of material fact
> exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)). If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts. See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998)

10

(citing <u>Ciarlante v. Brown & Williamson Tobacco Corp.</u>, 143 F.3d 139, 145-46 (3d Cir. 1988)).

Because no material facts appear to be in dispute - just the interpretation of those facts - the application of this standard is rather straightforward in this case.  The Court must decide whether, under the circumstances of the interactions alleged by both parties, a valid contract was formed.

**B.   Were the Unsigned Agreements Valid Purchase Offers by Senior Settlements?**

An enforceable contract requires an offer, an acceptance, consideration, and a meeting of the minds upon all the essential terms of the agreement.  <u>See, e.g.</u>, <u>Weichert Co. Realtors v. Ryan</u>, 128 N.J. 427, 435 (1992); <u>West Caldwell v. Caldwell</u>, 26 N.J. 9, 24 (1958); <u>Friedman v. Tappan Dev. Corp.</u>, 22 N.J. 523, 531 (1956).

> An offer occurs when one party communicates to another a willingness to enter into a contract and does so under circumstances [that] justify the other party's understanding that if the offer is accepted, an agreement would result. An offer must be reasonably clear, definite and certain in all its essential terms.
>
> An acceptance occurs when a party shows intent to agree to an offer. The acceptance may be made by words or conduct. It must be made before the offer is withdrawn or lapses, and it must match the terms of the offer exactly. A proposal to accept an offer on any different terms is not an acceptance of the original offer. If any new or different terms are proposed in response to the offer, the

> response is not an acceptance but rather a
> counter-offer. A counter-offer is a new offer
> by the party making that proposal. The new
> offer must in turn be agreed to by the party
> who made the original offer for there to be an
> acceptance.

N.J. Model Civil Instr. 4.10C.

_____Plaintiff focuses its argument on whether the terms of the purported offer were reasonably clear, certain and definite. However, those are not the dispositive issues.  As noted above, the purported offer contained two relevant limitations, by its terms, (1) it was supposed to be signed in order to be deemed an offer and (2) it expired on July 23, 2004.

Plaintiff argues that the lack of a signature was not important because the agreements evidenced an intent to be bound and because they, and Defendants, waived the signature requirement by behaving as if a contract existed between them. The Court need not resolve the issue of the signature, except to note that any waiver of the signature requirement was never communicated to Defendants by word or deed.

But even if there had been a signature on the offer, the offer was not open when the Trustees attempted to accept it by signing and returning it on August 10, 2004.  Thus, it was impossible for that attempted acceptance to form a contract.  See Restatement (First) of Contracts § 40(1) (1932)("The power to create a contract by acceptance of an offer terminates at the

12

time specified in the offer, or, if no time is specified, at the end of a reasonable time."); Restatement (Second) of Contracts § 41(1) (1981) ("An offeree's power of acceptance is terminated at the time specified in the offer, or, if no time is specified, at the end of a reasonable time.") "Just as the offeror is at liberty to make no offer at all, it is also at liberty to dictate whatever terms it sees fit if it chooses to make an offer. Among these requirements may be acceptance within a specified time, and if no acceptance is made within that time, the power of acceptance necessarily expires."  1 Richard A. Lord, Williston on Contracts § 5:5 (4th ed. 2007).  Because the time for acceptance was specified in the offer, because the time was deemed to be "of the essence," and because the offer was not accepted before that time expired, there was no contract formed at that time, under the undisputed material facts.

Senior Settlements argues that while in general a time-limited offer cannot be accepted past its expiration, there is an exception when the offeror waives that conditions by assenting to a late acceptance.  (Pl.'s Br. in Supp. of Mot. for Summ. J. at 9.)  In support of this contention, Senior Settlements points to a New Jersey Appellate Divison case, Synnex Corp. v. ADT Sec. Servs., Inc., 928 A.2d 37 (App. Div. 2007), which is actually a case about the power of an offeree who drafts a form contract to alter the means of acceptance from the means described in the

form, id. at 42.  In other words, that offeree could accept the contract by signing or performing, even if the contract initially said that the contract must be accepted by signature.  Synnex does not alter this Court's understanding of the dealings between the parties here: while Senior Settlements could have accepted Defendants' counteroffer by signing the agreement or performing, in either case that acceptance must have been made known to Defendants in order to bind them to the agreement.

In Synnex, ADT, a security alarm company, agreed through an agent to install certain alarms at Synnex's warehouse.  After ADT installed the agreed-upon system, there was a burglary at the warehouse.  Pursuant to subsequent litigation, ADT attempted to disclaim its contractual obligations to Synnex by arguing that the form contract required signature by ADT's home office, which never occurred.  The Appellate Division found there was an agreement notwithstanding the absence of that signature because ADT had indicated its waiver of the requirement by performing the contract.

> ADT's shipment and installation of the security system at the Synnex warehouse and subsequent monitoring constituted an unequivocal acceptance of the contract. Moreover, Synnex's receipt and payment for these goods and services reflected its understanding that it had contracted with ADT in accordance with the terms of the ADT form contract.

Id. at 43.

14

The Synnex case is not a good analog for the conduct that occurred in this case.  Here, any performance by Senior Settlements was incomplete, in that no payment was tendered. Further, no aspect of Plaintiff's alleged performance was made known to Defendants.  Withdrawal of the funds from the policies, unbeknownst to Defendants, did not constitute "unequivocal" acceptance of the unsigned contracts.  Indeed, the evidence shows that Plaintiff was aware the Defendants were continuing to pay the premiums on their policies, because Defendants believed ownership of the policies had not been transferred to Plaintiff, that is, that the contract had not been performed, and yet Plaintiff did nothing to inform Defendants that their obligation to pay had terminated.

Nor, contrary to Synnex, did Defendants receive or retain anything from Plaintiffs that could have indicated their understanding that there was an agreement.  On the contrary, by continuing to pay on the policies, Defendants behaved as if no agreement had been consummated.

A more analogous situation to Synnex would appear if Defendants had received and retained payment from Senior Settlements.  In that case, the parties would be in the same position as the parties in Synnex - having both received what they bargained for under the agreement.

15

Plaintiff also points to the Third Circuit's decision in Roadway Express, Inc. v. General Teamsters, Chauffeurs & Helpers Union, 330 F.2d 859, 863-64 (3d Cir. 1964), in which the court explained that, a "party, who has originally insisted that both parties sign a document before a mutually binding agreement may come into existence, may dispense with that requirement," and will be bound if the conduct of both parties indicates their acceptance.  In this case, there was conduct indicating acceptance on one side, not communicated to the other, and conduct indicating confusion on the side of the signing party. Plaintiff admits that Defendants did not know and had no reason to know of its performance prior to the tender of payment.  This is so because Plaintiff argues that the contract came into being when Defendants accepted it.  Having found that the offer expired when Defendants accepted it, something more must have happened in order for a contract to come into being: either retention of benefits by Defendants or some indication to them that Plaintiff was performing.

This Court predicts that if the New Jersey Supreme Court were faced with the issue that faces this Court today, it would find that there was no contract when Defendants attempted to accept an expired offer and (1) Plaintiffs, although beginning to perform, did not make their conduct known to Defendants; (2) Defendants had no reason, by all accounts, to know that

16

Plaintiffs were performing; and (3) Defendants received no benefit of Plaintiffs' partial performance prior to terminating their counteroffer.

Senior Settlements cites no case applying New Jersey law that describes how an offeror can waive a time-limit in its offer. Nevertheless, the Court finds that Senior Settlements could have waived its insistence on the specific time for acceptance by negotiating with Defendants and explicitly agreeing to extend the time limit, or by otherwise accepting the counteroffer in a reasonable time by performance or otherwise. Williston points out that "Often, an offeror who has imposed a limit of time in its offer does not in fact insist upon it, and by further negotiations the offeror may indicate a continued willingness to stand by the terms of its offer. Any such manifestation of continued willingness on the part of the offeror will extend the time during which acceptance may occur, constituting in effect a new offer, which may be accepted and if so accepted will ripen into a contract." Williston on Contracts § 5:5. Because there was no explicit or implicit extension of time in this case, there was no contract when Defendants belatedly accepted the offer. On the contrary, Senior Settlements indicated that, due to the passage of time, it was unwilling to stand by the terms of its original offer. Where Plaintiff itself had declared time to be of the essence in

limiting the duration of the offer, the absence of an explicit or implicit modification of this essential deadline rendered the offer a nullity after 5:00 p.m. on July 23, 2004.

By e-mail dated July 30, 2004 Senior Settlements indicated that the delay in receiving the signed agreements from Defendants might cause its offer price to change.  Senior Settlements also stated that if it did not soon receive the signed agreements and other documents required under the agreements it would rescind the offer.  (Ex. G to Wolfe Cert.)  In light of the fact that time was of the essence in the original offer, the Court determines that the offer had expired before Defendants attempted to accept it.

In this case, there was no negotiation to extend the offer period and no communication by Senior Settlements that it was willing to honor its original offer beyond the proffered offer period.  Indeed, the communications between the parties indicate that beyond the deadline, Senior Settlements reserved the right to change the purchase price and thus, the essential terms of the offer.  When Defendants belatedly attempted to accept, there was no meeting of the minds; neither party knew to what they had agreed, or, indeed, if there had been any agreement at all. There was no subsequent communication from Senior Settlements regarding its intentions to pay Defendants.

18

**C.   Did the Trust Make a Counteroffer?**

Thus, when the Trustees returned the documents, beyond the deadline, with their signatures, they communicated a counteroffer.  As the New Jersey courts recognize, a proposal to accept an offer on different terms is not an acceptance of the original offer, but a counter-offer, which does not create a contract unless it is in turn agreed to by the party who made the original offer.

> [A] contract does not come into being unless there be a manifestation of mutual assent by the parties to the same terms; and, while the manifestation of mutual assent is usually had by an offer and an acceptance either in words or by conduct, it is elementary that there can be no operative acceptance by acts or conduct unless the offeree's assent to the offer according to its terms is thereby unequivocally shown. There must needs be an agreement -- a "meeting of the minds" on the subject matter, to use a classic timehonored term, or there is no legally enforceable obligation. An expression of assent that modifies the substance of the tender, while it may be operative as a counter-offer, is yet not an acceptance and does not consummate a contract. In the very nature of the contract, acceptance must be absolute.

Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 538 (1953). See also Larsen & Fish, Inc. v. Schultz, 5 N.J. Super. 403, 405 (App. Div. 1949) ("A reply to an offer, although purporting to accept it, which adds qualifications or requires performance of conditions, is not an acceptance but is a counteroffer."); Carlin v. Newark, 36 N.J. Super. 74, 89 (Law Div. 1955) ("to constitute

a valid binding contract the proposal of the one party must be met by an unqualified acceptance by the other party and . . . the acceptance must correspond entirely with the essential terms contained in the proposal.").

The key difference in Defendants' response was the time of the sale, which the original offer had itself stipulated was an essential term.  Cf. Weichert, 128 N.J. at 435 ("if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract").  Thus, when the Trustees sent back the Agreements, they communicated a counteroffer by varying an essential term of the offer.

The issue then is whether Senior Settlements accepted that counteroffer before any effective revocation of the offer occurred.  An acceptance occurs when a party assents, through words or conduct, to the essential terms of an offer.  Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435-36 (1992).  Because Senior Settlements never signed and returned the agreement or otherwise directly communicated its acceptance to the Trustees, the Court must determine whether they accepted the counteroffer by their conduct.  This acceptance by performance does not operate to create a contract unless the performance is somehow communicated or made known to the offeror.  As the New Jersey

20

Supreme Court has said, silence does not normally constitute

acceptance, even if performance has begun[4]:

> We have held that "[i]t is requisite that
> there be an unqualified acceptance to
> conclude the manifestation of assent."
> Johnson & Johnson, supra, 11 N.J. at 539, 95
> A. 2d 391.  An offeree may manifest assent to
> the terms of an offer through words, creating
> an express contract, or by conduct, creating
> a contract implied-in-fact. See Restatement
> (Second) of Contracts § 19(1) (1981). Silence
> does not ordinarily manifest assent, but the
> relationships between the parties or other
> circumstances may justify the offeror's
> expecting a reply and, therefore, assuming
> that silence indicates assent to the
> proposal. Johnson & Johnson, supra, 11 N.J.
> at 539; 1 Williston on Contracts § 91 (3rd
> ed. 1957). Section 69(1)(a) of the
> Restatement (Second) of Contracts provides:
>
>> (1) Where an offeree fails to reply
>> to an offer, his silence and
>> inaction operate as an acceptance
>> in the following cases only:
>>
>> (a) Where an offeree takes the
>> benefit of offered services with
>> reasonable opportunity to reject
>> them and reason to know that they
>> were offered with the expectation
>> of compensation.
>
> Thus, courts have held that when an offeree
> accepts the offeror's services without
> expressing any objection to the offer's
> essential terms, the offeree has manifested
> assent to those terms.

Id. (citations omitted).  In this case, there was no

manifestation of Senior Settlements' assent to the counteroffer

---

[4]  Plaintiff does not argue that Defendants are bound to
perform under a quasi-contract or other equitable theory.

sent by the Trustees prior to their payment of funds to the
Trust.  Indeed, that is why Defendants apparently began
requesting signed copies of the Agreements and the Trustees
continued paying the premiums on the policies they no longer
owned.  Defendants correctly understood their counteroffer had
not been accepted.

Further, silence was not a proper means of acceptance by
Senior Settlements in this case because Senior Settlements did
not accept any goods or services from Defendants, which would
have notified Defendants of Plaintiff's intent to accept.

However, the eventual tender of payment, the performance of
the contract, was acceptance by Senior Settlements unless it came
too late; that is, unless the offer had been revoked by that time
by force of the letters attempting to do so or because the
performance was unreasonably late.

Plaintiff argues that other conduct by it, including
transferring ownership of the policies and removing money from
them, constitutes acceptance by performance.  This would be so if
any of these acts had been communicated to Defendants.  The Court
has reviewed the multiple agreements in this case, including the
so-called "disclosure form."  Under them, it would be unclear to
a party to these agreements when they were accepted without an
explicit communication from Senior Settlements, given that they
were unsigned and the acceptance term had expired.  Senior

Settlements purports no obligation to pay the Trustees under the agreements until some time after several events have occurred, some of which would have been in the knowledge of Senior Settlements only, such as receipt by Senior Settlements of certain acknowledgments from the insurance company.

Of course, normally, individuals in the position of the Trustees would have been bound to the agreements they signed had they been valid offers when they did so.  That did not occur; the offers had expired.  Thus, their transmittal of the signed agreements to Senior Settlements was the communication of a counteroffer and any acceptance by Senior Settlements through performance must have been communicated to the Trustees, the counterofferors, in order to form a contract.

**D.   Did Defendants Revoke the Trust's Counteroffer?**

Thus, as alluded to above, Plaintiff could have accepted that counteroffer by performance or some statement to Defendants, but it failed to do so prior to attempting to make payment to them beginning in November.  By that time, however, Defendants had communicated that they no longer wished to enter an agreement with Senior Settlements.

The Court finds that the counteroffer by the Trustees was revoked by Michael Steinmetz in his letter of October 28, 2004, on behalf of all of the trustees.  There has been no argument that Michael Steinmetz, a trustee and a party to the

23

counteroffers, lacked authority to act on behalf of the Trust and thereby revoke the counteroffers.

On November 1, 2004, after the revocation, Senior Settlements wired payment for one policy to the Trust.  (Ex. P to Wolfe Cert.)   The Trustees immediately returned the funds via check and a letter, signed by Defendants Abraham and Fay Weingarten, which said:

> Dear Sir:
>
> ENCLOSED PLEASE FIND OUR CHECK IN THE AMOUNT OF $318,797.  THIS CHECK REPRESENTS THE AMOUNT OF THE UNSOLICITED WIRE RECEIVED IN OUR ACCOUNT FROM YOUR COMPANY.  PLEASE DO NOT SEND ANY MORE WIRES AS THEY WILL NOT BE ACCEPTED.

On January 10, 2005 Senior Settlements wired payments on the two other policies. (Ex. R to Wolfe Cert.)   On January 31, 2005 Abraham and Fay Weingarten returned those checks as well, along with a similar letter.

If the offers had not been revoked, this would probably have been acceptance within a reasonable time.  See Restatement (Second) of Contracts § 41(1) (if no time specified, offeree has reasonable period of time to accept).  However, the payments by Senior Settlements did not constitute acceptance because the counteroffers had already been revoked.  "An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract," Restatement (Second) of Contracts, § 42,

that is, when the offer is revoked.  Because Senior Settlements
apparently received that revocation by fax on October 28, 2004,
their payments on November 1, 2004 and January 10, 2005 could not
constitute acceptance by performance of the respective
agreements.

Further, there is no equitable reason to find that there was
an acceptance because Defendants promptly returned the wired
funds and Plaintiffs have made no other showing that they somehow
relied to their detriment on their understanding that a contract
existed.

    **E.    Breach by Late Payment**

An issue arose at oral argument over whether, even if a
valid agreement had been formed, Plaintiff breached it by failing
to pay Defendants within the time specified by the agreement.
Because there are conflicting payment terms in the forms
Defendants executed, and neither party had sufficiently addressed
how to resolve those terms, the Court requested and received
supplemental briefing on this issue.

Having found that no agreement existed between the parties,
it is unnecessary for the Court to determine whether Plaintiff
breached such an agreement by late payment.

The Court notes, however, that subsequent to the dealings
between the parties in this case, such "life settlements," also
known as viatical settlements, came under a comprehensive

25

regulatory regime in New Jersey.  <u>See</u> N.J. Stat. Ann. § 17B:30B-1 to -17.  Contracts for life settlements in New Jersey must now be approved by the New Jersey Commissioner of Banking and Insurance and may be rejected if they are misleading or otherwise unfair.

> A person shall not use a viatical settlement contract form or provide a disclosure statement or application form to a viator in this State unless it has been filed with and approved by the commissioner. The commissioner shall disapprove a viatical settlement contract form or disclosure statement form if, in the commissioner's opinion, the contract form, disclosure form, or provisions contained therein are unreasonable, contrary to the interests of the public, or otherwise misleading or unfair to the viator.

N.J. Stat. Ann. § 17B:30B-5.  Furthermore, such contradictory payment terms will not recur in New Jersey because in any future dealings in New Jersey, Plaintiff will be required to inform all those with whom they contract for life settlements that funds will be sent to them within three business days after the purchaser has received the insurer's acknowledgment that ownership of the policy has been transferred and the beneficiary has been designated pursuant to the contract.  N.J. Stat. Ann. § 17B:30B-8(a)(6).  Because the Legislature has developed a comprehensive scheme for dealing with when the right to payment arises and because resolution of that issue can make no difference in this case, since the Court has held that no valid agreement was formed in the first place, the Court shall not

26

reach out to interpret the various clauses of Senior Settlements'
forms that apparently can no longer be used in New Jersey.

**IV.   CONCLUSION**

For the foregoing reasons, the Court finds that no contract
existed between the parties prior to the Trustees' revocation of
their counteroffer.  Therefore, the Court shall deny the motion
by Plaintiffs and grant the motion by Defendants.  An appropriate
Order shall be entered.


**February 27, 2008**                        **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      U.S. District Judge